# EXHIBIT C

EXP IS SEPT 2011

## D E A L E R S H I P   C O N T R A C T

This agreement is defined and entered into by and between :

*AZIMUT BENETTI S.P.A.*, with offices in *Via Michele Coppino 104, Viareggio (Lucca), Italy*, hereinafter referred to as *"AZIMUT"*

and

*SKIPPER MARINE HOLDING INC.* with offices in 215 North Point Drive – Winthrop Harbour – IL 60096 – U.S.A. hereinafter referred to as *"DEALER"*.

In consideration of the mutual covenants contained herein, AZIMUT and the DEALER agree as follows:

## PREAMBLE

A) The DEALER possesses sufficient technical and commercial competence in the field of the non commercial motoryacht industry to ensure efficient distribution of such products in the Territory (as hereafter defined).

B) The DEALER also possesses sufficient skills to ensure promotion of Azimut Products (as hereafter defined) with the clientele and the display of these Products for sale.

C) The DEALER has the right to appoint subdealers or agents within the Territory subject to prior written approval by AZIMUT. In such a case the DEALER will remain directly responsible in respect of AZIMUT for its subdealers and/or agents activity.

D) The DEALER possesses or has at its disposal in its Territory the technical installations and the skilled labor necessary to ensure the launching, repair and complete service of AZIMUT's Products as better specified in the Dealer Qualification Book.

E) AZIMUT requires the DEALER to distribute the Products and supplementary equipment manufactured by AZIMUT and to promote effectively and efficiently their sales in the Territory.

F) AZIMUT requires the DEALER to follow the DEALER QUALIFICATION PROGRAM by fully complying with all rules, standards and procedures stated in the DEALER QUALIFICATION BOOK a copy of which has been delivered to the DEALER and forms an integral part of this Dealership Contract as **Appendix 1.** AZIMUT reserves the right to modify the DEALER QUALIFICATION BOOK at any time on prior written notice to DEALER.

## DEFINITIONS

In addition to the definitions made in other parts of this Contract, the parties agree that the following terms shall have the meaning hereinafter defined.

*i.*     Contractual Term

The term of this Agreement shall expire on ***September 15th 2011*** without further act or action of the parties, unless sooner terminated as provided herein. The Dealer recognizes that the term of the Agreement is limited and at the end thereof, the Agreement shall expire and there shall be no automatic right of renewal. Dealer acknowledges that Azimut makes no representation, warranty or covenant to renew the Agreement and any investment made by the Dealer in its business and sale, promotion and service of the Products is the Dealer's sole risk.

*ii.*     Exclusivity

The DEALER has the exclusive right to sell the Products to customers that will moor their boat in the Territory for not less than 181 days during the first 12 months from delivery of the boat.

This exclusivity is based upon the following two AZIMUT engagements:

- no other dealer will be appointed in the Territory, and

- no other dealer will be allowed to sell Products in the Territory.

*iii.*   <u>Notice</u>

A certified letter with return receipt requested or, if required by urgency, an e-mail or fax provided receipt of such communication is acknowledged in writing by the party to whom it is addressed. Notices shall be effective upon mailing.

*iv.*   <u>Options</u>

All components or equipment or customizations requested by the DEALER which are not included in the standard specification of the relevant model.

*v.*   <u>Order Contract</u>

The order contract used between AZIMUT and the DEALER for the confirmation of the purchase of each Product, a standard copy of which is attached hereto as **Appendix 2.**

*vi.*   <u>Products</u>

Boats manufactured by AZIMUT (listed in **Appendix 3** to this Contract) sold with the trademark 'AZIMUT', all supplementary equipment, accessories and spare parts of such boats, and clothing. AZIMUT reserves the right to include in or exclude from this list, at any time and without prior warning, any boat model, or supplementary equipment, accessories and spare parts of such boats by simple written notice to this effect.

*vii.*   <u>Territory</u>

The geographical area encompassed by the boundaries of: Minnesota, Wisconsin, Iowa, Illinois, North and South Dakota, Missouri, Kansas, Arkansas, Ohio, Kentucky, Indiana, Michigan.

viii.   <u>Trademarks</u>

The trademark AZIMUT and all other trademarks which are or will be registered on behalf of AZIMUT, a current copy of which is reproduced and described in the Dealer Qualification Book.

## ARTICLE I - <u>LEGAL STATUS OF THE DEALER</u>

1.1 - The DEALER has the right to purchase and to sell AZIMUT Products on its own name and for its own account. The DEALER has the status of independent DEALER vis-a-vis AZIMUT and vis-a-vis customers.

1.2 - The DEALER has the right to distribute the Products in the Territory on an exclusive basis. It is obliged to promote sales of the Products in the Territory in the most efficient manner, and to devote its best efforts to develop such sales.

The DEALER engages itself not to promote/sell/distribute products in competition with the Azimut Products.

1.3 - The DEALER is NOT authorized to act either in the name or as an agent of AZIMUT BENETTI S.p.A.

1.4 - The DEALER has the duty to protect the interests of AZIMUT with all the diligence required of a good merchant and to inform constantly AZIMUT of

its activity as well as the conditions of the market in the Territory. The DEALER has to supply AZIMUT monthly with reports of its sales, the number of Yachts still in stock, its sales promotions, and market conditions, as well as annually with copies of company profit and loss reports. All information used in these reports will be accessible to AZIMUT for inspection upon reasonable written notice.

## ARTICLE II – <u>UNDERTAKING OF THE DEALER</u>

2.1 - The DEALER has the duty to display the Products in the most apparent manner possible and under the most favorable conditions in all its show windows, show cases, display floors and any other places visited by the clientele, to which the DEALER has access either on a permanent or provisional basis.

2.2 - The DEALER shall not sell, promote or advertise the sale of Products outside the Territory.

2.3 - AZIMUT authorizes the DEALER to make known to its clientele its status of AZIMUT exclusive importer and distributor in the Territory. The DEALER may also use the "*AZIMUT exclusive importer and distributor for [...]*" on its letterhead, signs, prospectus and advertisements. DEALER acknowledges that AZIMUT has the exclusive right to use and to control the use of the Trademarks, and but for the limited, non-exclsuive right granted for DEALER to use of the AZIMUT name and trademarks as provided in this Agreement, Dealer would have no right to use the same.

2.4 - The DEALER accepts and undertakes, with respect to the Products it will sell, to fulfill the obligations set out in the "Azimut Warranty Book" here attached as **Appendix 4**.

2.5 - In purchasing each boat, the DEALER and AZIMUT will execute an Order Contract where AZIMUT undertakes, with respect to the Products sold to the DEALER, only the express warranty obligations valid with respect to the DEALER. It is here agreed by the Parties that the terms and conditions set out in the Order Contract may be modified by AZIMUT either generally or in respect of any particular Order Contract.

2.6 - Dealer shall carry in stock at all times during the term of the Agreement such inventory of Products as Dealer's volume of sales or service may require. Dealer shall in no event carry less than the minimum Products established from time to time by AZIMUT. Dealer's required minimum Products inventory will change as new Products are added to AZIMUT's available products.

### ARTICLE III - CONDITIONS OF SALE AND TITLE

3.1 - AZIMUT will supply the DEALER with Products in so far as available, at the conditions set out in this contract.

3.2 - Provided the entire Purchase Price and all other sums due and owed by the Buyer to Azimut in respect of this Order have been paid in full, title to the Yacht will be deemed to be transferred to the Buyer when one of the following has occurred:

    (i)    in case of delivery "ex-works" when the boat is loaded on the truck, or

    (ii)    in case of delivery "*cost insurance freight*" when the boat is loaded on the ship, or

    (iii)    in case of delivery "*free along side*" at the start of the loading operations of the boat,

    (iv)    in any other case upon signature of the Protocol of Acceptance and Delivery.

3.3 - AZIMUT will sell the Products to the DEALER using the prices resulting from the price list contained in **Appendix 5** to this contract (the "**Price List**"). AZIMUT reserves the right to modify Prices by giving the DEALER thirty (30) days prior written Notice. Prices are normally modified by AZIMUT once a year effective as of 1st of September, however, Azimut reserves the right to modify its prices at any time. Prices are for delivery cost insurance freight New York or Miami.

3.4 - AZIMUT may, at its sole discretion, refuse any requested modification to the orders. Modifications are valid only if accepted by AZIMUT in writing.

3.5 - The Dealer will have the following discount structure on the Prices indicated in the Price List The DEALER will be granted on the options the same percentage discount applied on the relevant model (**Appendix 5**).

| | |
|---|---|
| AZIMUT 43' | 30% |
| AZIMUT 47' | 25% |
| AZIMUT 50' | 25% |
| AZIMUT 53' | 25% |
| AZIMUT 55' | 25% |
| AZIMUT 58' | 25% |
| AZIMUT 62' | 25% |
| AZIMUT 68' | 25% |
| AZIMUT 70' | 25% |
| AZIMUT 78' | 25% |
| AZIMUT 82' | 25% |
| AZIMUT 88' | 25% |

| AZIMUT 43'S | 25% |
|-------------|-----|
| AZIMUT 62'S | 25% |
| AZIMUT 68'S | 25% |
| AZIMUT 72'S | 25% |
| AZIMUT 86'S | 25% |

3.6 — FLOOR PLAN. Azimut recognizes the Dealer six (6) month floor plan assistance for boats ordered in stock and kept in inventory. In case the boat is sold within the six (6) month period, the floor plan will be recognized for the effective time kept in stock.

## ARTICLE IV – FURTHER UNDERTAKINGS OF THE DEALER

4.1 - The DEALER has to make its best efforts in order to establish the best image for AZIMUT in the Territory and to promote the sales of Products and achieve the highest turnover therein.

4.2 - The DEALER must operate through at least one permanent agency offices to ensure an adequate promotion of the AZIMUT Products at its own expenses. The DEALER must within 2 weeks from the execution of this Contract communicate to AZIMUT where its offices are and/or when and where it will open its new offices. The DEALER undertakes to follow the rules and instructions set out in the Dealer Qualification Book in any refitting, restructuring and opening of any of its offices and yards.

4.3 - Pursuant to the rules and instructions set out in the Dealer Qualification Book, the DEALER and all its network locations have to show an "AZIMUT Yachts" sign where its offices or service yards are established.

## ARTICLE V - ADVERTISING

5.1 - The DEALER will promote the Product locally by organizing VIP receptions, meetings and introductory cocktails as better specified in the Dealer Qualification Book.

5.2 - The DEALER shall be responsible for advertising and/or marketing activity in the Territory and DEALER and AZIMUT shall mutually agree on a budget for the contractual year. If an agreement is not reached on the budget, AZIMUT will establish the budget based upon dealers in similar territories. The cost of all advertising and sales promotion activities shall be borne by the DEALER. Such advertising will be performed consistently with AZIMUT's advertising standards set out in the Dealer Qualification Book. On a monthly basis and prior to its publication or utilization, the DEALER will transmit to AZIMUT a copy of each and every advertisement and/or marketing material that it will use concerning the Products. The DEALER acknowledges that AZIMUT may request changes and deny the publication of those

advertisements and marketing material which it will reasonably deem not in line with AZIMUT standards as defined in the Dealer Qualification Book.

5.3 – Prior to the expiration of the contractual year, the DEALER will reconcile to AZIMUT the expenditure of the budget for advertising.

5.4 – AZIMUT will provided DEALER with a sufficient number of brochures and marketing material which will be free of charge for the DEALER. Further quantities will be sold "at cost". Any duplication will be strictly forbidden being understood that in case of violation of this instruction and or violation of copyrights on any image, content or right anyway connected to such material the DEALER will be fully liable of damages and herein expressly undertakes to hold AZIMUT harmless from any and all damages or claim coming from third parties or such violations. Unless expressly regulated in the Dealer Qualification Book, the DEALER will be allowed to apply a sticker positioned identifying the Dealer on the back side of each AZIMUT packaging, brochure or other marketing material.

5.5 – Transportation costs of all brochure, marketing and promotional material will be at the DEALER's charge. The DEALER will receive on a regular basis the invoices regarding the purchase of promotional material and the transport costs. Payment shall be remitted by wire-transfer to AZIMUT or deducted in the monthly wire compensation.

5.6 – Shipments of promotional material will be either "freight collect" or "freight prepaid" at the DEALER's choice. The method of shipment selected by the DEALER should be shown on the order.

5.7 – Within NOVEMBER 2009, the DEALER should agree with the Marketing Dpt. a Marketing plan for the season 2009/2010.


## ARTICLE VI - BOAT SHOWS

6.1 – Each year the DEALER will have to attend the Ft. Lauderdale Boat Show and the Miami Boat Show organized by AZIMUT. DEALER agrees on a contribution per each show (actual amount of the contribution to be agreed with the Marketing Dept.). At the Boat Show the DEALER will have the availability of a non-exclusive meeting room and all other facilities arranged by AZIMUT such as bar service in the display, brochures, organization assistance etc.

6.2 – The DEALER must, at its own expenses, take part to its local boat show(s) and arrange a display according to the rules and instructions set out in the Dealer Qualification Book or if different according to the guidelines that will from time to time be agreed upon with AZIMUT's Sales and Marketing Departments.

6.3 – The DEALER will promote the Product and the AZIMUT Brand locally by organizing at least one event per year in the Territory where the Dealer will invite already existing customers as well as potential. Should such event be organized with an AZIMUT contribution for at least 25% of the cost, AZIMUT will have the right to extend the invitation also to existing and potential customers of other Azimut Dealers. AZIMUT will in any case do its best to assist the DEALER by coordinating and inviting journalists as well as

have its co-marketing partners participate at the event in the manner agreed form time to time with the DEALER.

6.4 – Every year AZIMUT will organize, at its cost, an event in one of its marinas in Italy or abroad (Varazze, Viareggio, Livorno, Moscow, etc.) where customers and journalist will be invited from all over the world to sea trial all the AZIMUT Product range (subject to availability). Within January 31st of each year AZIMUT will communicate the place, date and program of the event to the DEALER. To this regard the DEALER will do its best to bring its clients (not at AZIMUT's cost) to the event and possibly organize with AZIMUT a tour at AZIMUT shipyards in Avigliana (Turin) or Viareggio.

### ARTICLE VII – INVOICING SYSTEM FOR PROMOTIONAL MATERIAL

7.1 – The DEALER will receive on a regular basis the invoices regarding the purchase of promotional material and the transport costs. Payment should be remitted by wire-transfer.

### ARTICLE VIII – TERMS OF PAYMENT

8.1 – Unless otherwise agreed in writing, all Products must be paid by the DEALER as follows for all boat orders:

*Motorcruiser* 43, 43S

- 20% at order upon signature of the Order Contract

- balance before delivery ex-works

*Motorcruiser* 47, 50, 53, 55, 58, 62, 68, 70, 62S, 68S and 72S

- 20% at order upon signature of the Order Contract

- 20% on engines installation

- balance before delivery ex-works

*Motoryacht* 78, 82, 88 and 86S

- 25% on signature of the Order Contract

- 25% on fiberglass hull completion

- 25% on engines installation

- 25% before delivery ex-works

***unless different agreement reached by parties case by case.***

8.2 – The DEALER has to comply with the terms of payment stated above, should the DEALER fail to comply with such terms and conditions AZIMUT will have the right to cancel the order and/or terminate this Contract as of right pursuant to the procedure set out in Article 18, below, in to all other rights and remedies available at law.

## ARTICLE IX – PROTOCOL OF ACCEPTANCE AND CHECK LIST

9.1 – According to the procedure set out in the Dealer Qualification Book, before or after title to the boat is transferred to the DEALER according to the provisions of Article 3.2 above, the DEALER, within 14 days from the date when the boat is put at its disposal - this meaning (A) if the boat is delivered in SAVONA or VIAREGGIO, when the boat in tendered for delivery in writing, or (B) if the boat is transported to the DEALER's premises, when the boat arrives at the DEALER's premises – must:

    (i)    sign the Protocol of Acceptance in the form set out in the Dealer Qualification Book and deliver it to AZIMUT together with the Check List.

    (ii)    directly or through appointed experts, carry all the necessary controls on the Products for the discovery of any cosmetic defects and missing items with respect to the relevant contractual and technical specifications, according to the procedure set out in the Dealer Qualification Book; .

Partially notwithstanding the above provisions, the DEALER <u>must</u> carry out the activities described under (i), (ii) and (iii) hereabove in Viareggio for all boats built in the Viareggio shipyard, and the DEALER undertakes to do all his best efforts to carry out the same in Savona for boats built in Avigliana.

9.2 - Failing a claim by written notice from the DEALER containing details of any cosmetic defefcts or missing items within the aforesaid time limit, the DEALER shall be precluded from invoking the existence of any cosmetic defects or missing items

9.3 - In any event AZIMUT's obligations to the DEALER may never exceed that set out in the Azimut Warranty Book and the other terms and conditions contained in the relevant Order Contract.

## ARTICLE X - CONDITIONS OF RESALE BY THE DEALER

10.1 -AZIMUT shall establish in its discretion suggested minimum prices for the Products and will inform Dealer of the suggested minimum prices established from time to time. This provision does not bind Dealer to sell the Products at the suggested minimum price. However, if Dealer exercises its right to sell Products for less than the minimum price, AZIMUT retains the right to immediately cease supplying Dealer with Products and to cancel all outstanding orders, whether accepted or not, without prior notice to Dealer, notwithstanding any other provision of this Agreement, in addition to all other rights and remedies provided herein or available at law.

10.2 – In reselling the Products the DEALER shall represent to each customer the contents and limits of the Azimut Warranty Book and in the resale agreement shall, to the extent applicable, reproduce the same terms and conditions contained in the Order Contract executed with AZIMUT for the Product to be resold.

10.3 - The DEALER shall sell the Products in the same conditions as they are received by it and shall not alter, remove or in any way temper with any of the AZIMUT Trademarks, marks or numbers on the Products. The DEALER

will have the right to attach to the Products its name indicating the DEALER is an authorized distributor of Azimut

## ARTICLE XI   STOCKS AND SPECIAL CONDITIONS

11.1 – This contract renewal is subject to the achievement of net value of invoiced boats of $ 6.100.000 to be delivered during the season 2009-10.

## ARTICLE XII   AFTER SALE ASSISTANCE, END CUSTOMER WARRANTY AND 'WARRANTY EXTENTION' PACKAGE

12.1 - At own expense DEALER shall organize and maintain an appropriate and adequate after-sale assistance service in compliance with the rules and instructions confirmed in the Dealer Qualification Book.

12.2 - DEALER undertakes to provide assistance, also under warranty, for all AZIMUT boats in ports or marinas situated in the Territory, both those sold by DEALER or otherwise, at the conditions provided in the Dealer Qualification Program.

12.3 - DEALER expressly accepts and undertakes to comply with the content of the Azimut Warranty Booklet, with reference both to the Warranty for Pleasure-boat Customers and to the Warranty for Professional Customers. For such purpose the Azimut Warranty Booklet is annexed to this agreement (Appendix 4)

12.4 - DEALER further expressly accepts all conditions any Limited Azimut Warranty Extention Package described in the Azimut Warranty Booklet and undertakes to offer it to its customers, refraining from proposing its own service packages or however, packages that have not been previously agreed with AZIMUT.

12.5 - DEALER undertakes to carry out Maintenance-services for all Azimut boats (as per DQP rules) including Free maintenance-services provided for new boats up to 70 feet and Maintenance services included in any Limited Azimut Warranty Extension Package implemented on specific boats.

12.6 - DEALER shall refrain from seeking payment for Free-services and any Maintenance-services included in any Limited Azimut Warranty Extension Package and implemented on boats, and shall strictly comply with the provisions set out in the Dealer Qualification Program.

12.7 - AZIMUT shall reimburse DEALER costs for approved interventions under warranty as per warranty conditions (see warranty booklet) and DQP Book

12.8 - The Dealer labour rate will be mutually agreed

12.9 - The Warranty labour rate is calculated as per DQP rules

## ARTICLE XIII - ASSISTANCE AGAINST UNFAIR COMPETITION AND INFRINGEMENT OF INDUSTRIAL PROPERTY RIGHTS

13.1 - The Dealer shall cooperate with AZIMUT to carry out all actions necessary to protect the Trademarks in the Territory. The Trademarks shall not be used in any manner liable to invalidate the registration thereof and the right to use the Trademarks in connection with the appropriate Products is

only granted to the extent that AZIMUT is able to do so without endangering the validity of the registration. The Dealer shall (insofar as it becomes aware thereof) notify AZIMUT of any unauthorized use in the Territory of the Trademarks or of any other intellectual or industrial property rights in the control or ownership of AZIMUT. At the request of AZIMUT the Dealer shall take part in or give assistance in respect of any legal proceedings and execute any documents and do any things reasonably necessary to protect AZIMUT's intellectual and industrial property rights (including without limitation the Trademarks) in the Territory. The Dealer shall leave in position and not cover or erase any notices or other marks (including without limitation details of patents or notices that a trademark design or copyright relating to the Products is owned by Azimut) which Azimut may place on or affix to the Products. The Dealer undertakes not to apply the Trademarks to any item not one of the Products nor to distribute or sell any such items with the Trademarks so applied or to engage in any other practice or activity likely to mislead potential purchasers into believing that an item is one of the Products when in fact it is not.

## ARTICLE XIV - <u>BUSINESS OR ENTERPRISE SECRETS</u>

14.1 - The Dealer shall keep confidential and not disclose to any third party, except for reasonably implementing for the purposes of this Agreement, all information relating to the Products (whether technical or commercial) and to the affairs and business of Azimut and its subsidiary or associated companies, whether such information is disclosed to the Dealer by Azimut or otherwise obtained by the Dealer as a result of its association with Azimut. Without prejudice to the generality of the foregoing where the Dealer is a company within a group of companies and or its activities in pursuance of this Agreement are carried out through a branch office or other local establishment in the Territory, the said information shall not without the prior consent of Azimut be disclosed to other companies within such group and or to any employees of the Dealer who are not employed at the said branch office or local establishment. This clause is not intended to prohibit 1) the fact of existence of a contract to distribute Products of Azimut; 2) review of the Agreement by Dealer's legal counsel or its normally used Contracts Specialist/Administrator that may be an employee of Dealer or an affiliate of Dealer; 3) review by legal and professional advisors, after a breach is alleged by Azimut, to review material and matters relating to the breach but only for purposes of rectification or defense; or 4) governmental authorities to who sharing of such information is necessary in order to implement the sale of Products. For the avoidance of doubt this provision shall survive the expiry or termination (for whatsoever cause) of this Agreement. Confidential Information shall not include any information which is or becomes known to the general public, which is already in the other party's possession prior to disclosure by the primary party or which is independently generated by either party without use of the Confidential Information.

## ARTICLE XV - <u>NO ASSIGNMENT OR TRANSFER</u>

15.1 — This Contract may be assigned or transferred by the DEALER only with the prior written consent of AZIMUT and only if the assignee or transferee has duly accepted in writing the provisions of this agreement and assumes, in all respects, the DEALER's duties relative to rights so assigned.

In all other cases of assignment or transfer, AZIMUT may cancel the contract as of right, in accordance with Article 19.2 hereinbelow.

15.2 - For the purposes of the preceding paragraph, any agreement resulting in substantial modification of the ownership, control, or management of the DEALER shall be considered by AZIMUT as a transfer necessitating its prior agreement by notice.

## ARTICLE XVI — <u>INDEMNIFICATION</u>

16.1 Azimut agrees to assume the defense of Dealer and to indemnify Dealer against any money judgment, less any offset recovered by Dealer, in any lawsuit naming Dealer as a defendant, where such lawsuit solely relates to: (a) an alleged breach of any warranty relating to any Products; or (b) bodily injury or property damage claimed to have been caused by a defect in the design, manufacture or assembly of a Product prior to delivery thereof to Dealer (other than a defect which could have been detected by Dealer in a reasonable inspection); provided, however, that if any information discloses the possibility of Dealer negligence, error or omission of any nature, or should it appear that the Products involved in such lawsuit had been altered by or for Dealer or if Dealer has violated any of the provisions of this Agreement, then Dealer will immediately obtain its own counsel and defend itself at Dealer's cost, and Azimut will not be obligated to defend or indemnify Dealer further. Dealer shall notify Azimut of any claim which Dealer will assert Azimut might be obligated to defend under this Section within thirty (30) days of Dealer's receipt of notice of said claim(s). Azimut will have up to sixty (60) days to conduct a preliminary investigation to initially determine whether Azimut is obligated to defend under this Section. Notwithstanding any such investigation, Azimut may retender defense of any action to Dealer at any time in the event information discloses Dealer may have altered products, breached this Agreement or committed negligence, errors or omissions. Dealer will take the steps necessary to protect its own interests and the interests of Azimut involved in the lawsuit until such time as Azimut may assume the active defense of Dealer. Azimut will, if it assumes the defense of Dealer, reimburse Dealer for reasonable attorneys' fees and court costs incurred by Dealer from the date of the tender. Azimut, if it assumes Dealer's defense, will have the right to retain and direct counsel of its own choosing, and Dealer shall cooperate in all matters during the course of defending the lawsuit.

16.2 Upon request of Azimut, Dealer shall indemnify, defend and hold Azimut harmless from any claim, demand, cause of action or cost, including attorney fees incurred by Azimut relating thereto, which may arise or be asserted against Azimut, if such claim, demand or cause of action results

or allegedly results from: (a) Dealer's failure to comply, in whole or in part, with any obligation of Dealer under the Agreement; (b) any actual or alleged negligence, error, omission or act of Dealer in connection with the sale, preparation, repair or service (including without limitation warranty service) by Dealer of the Products; (c) any modification of any Products made by or on behalf of Dealer, except those made pursuant to the express written instruction or with the express written approval of Azimut; (d) Dealer's breach of any agreement between Dealer and Dealer's customer or other third party; or (e) unauthorized warranties, misleading statements, misrepresentations or deceptive or unfair practices by Dealer, directly or indirectly, to Azimut, a customer or a third party. Azimut shall notify Dealer with reasonable promptness of the existence of any claims and allow Dealer an opportunity to resolve such claims, provided that no resolution or settlement shall be binding upon Azimut without its written approval thereof. Azimut may, but shall not be obligated to, tender defense of any such claim, demand or cause of action to Dealer. Azimut may, but shall not be obligated to, retain counsel of its choosing to defend an indemnified claim under this paragraph and Dealer shall reimburse Azimut for any costs or attorneys' fees as incurred. Dealer shall obtain and maintain comprehensive general liability insurance, through solvent and reputable carriers, in amounts satisfactory to Azimut and shall name Azimut as an additional insured, as its interests appear, on such policies. Dealer shall provide Azimut with a certificate of insurance evidencing such coverage which shall require that Azimut receive not less than thirty (30) days notice of cancellation or modification of such coverage.

## ARTICLE XVII – <u>SURVIVAL</u>

17.1.   The provisions of Articles 14, 16, 18, 19 and 20 shall survive the expiration or termination of this Agreement and any claims Azimut may have for the collection of money or the enforcement of any obligations which may be in the nature of continuing obligations shall also survive the expiration or termination of this Agreement.

## ARTICLE XVIII – <u>TERMINATION AND WAIVER</u>

18.1   The Agreement may be terminated, at any time, by mutual agreement of Azimut and Dealer.

18.2   The Agreement shall terminate and expire at the end of the Contractual Term, unless sooner terminated as provided in this Agreement.

18.3   Azimut may terminate the Agreement, at any time, after the occurrence of any one or more of the following events of default, upon thirty (30) days prior written notice:

a)    Failure by Dealer to secure and continuously maintain any license necessary for the conduct by Dealer of its Dealership Operations pursuant to the Agreement or the termination, expiration without renewal or suspension or revocation of any such

license for any reason whatsoever, whether or not that license is reinstated;

b)     Any change, transfer or attempted transfer by Dealer, voluntarily or by operation of law, of the whole or any part of the Agreement or any interest or legal or beneficial ownership therein or any right or obligation thereunder, directly or indirectly, such as, for example only, by way of an underlying ownership interest in Dealer or the Dealership Operations or the assets thereof outside the ordinary course of business, without prior written consent of Azimut and any purported change, transfer or assignment shall be null and void and not binding on Azimut;

c)     Impairment of the reputation or the financial condition of Dealer subsequent to the execution of the Agreement; or the ascertainment by Azimut of any facts existing at or prior to execution of the Agreement which tend to impair such reputation or financial standing;

d)     Failure by Dealer to pay when due any accounts or other monies due to Azimut from Dealer;

e)     Submission or participation in the submission to Azimut of any false or fraudulent statement, application, report, request for issuance of reimbursement, compensation, refund or credit, including without limitation any false or fraudulent claim for warranty work, labor rate, set-up reimbursement or warranty coverage;

f)     Use by Dealer of any deceptive or fraudulent practice, whether willful, negligent or otherwise, in the sale of any Product;

g)     Any indictment for any crime or violation of any law by Dealer which, if Dealer or its employee is found to have violated, may have an adverse effect on the reputation of Dealer, the Dealership Operations or Azimut; or any conviction in any court of original jurisdiction of Dealer or any employee of Dealer for any crime or violation of any law if, in the opinion of Azimut, such conviction or violation may adversely affect the conduct of the Dealership Operations or tend to be harmful to the goodwill or reputation of Azimut, Products or the Trademarks;

h)     Dealer's entering into any agreement, combination, understanding, conspiracy or contract, oral or written, with any other party with the purpose of fixing prices of Products or otherwise violating any law;

i)     Dealer's abandonment of Dealership Operations or failure to maintain a going business, open during customary business hours for the days and hours as is customary for retail businesses;

j)     Dissolution or liquidation of Dealer;

k)     Failure of Dealer to make the improvements, alterations or modifications of the dealership premises which are required to meet facility requirements established by Azimut from time to time

or which Dealer has agreed or represented to Azimut that Dealer will make or do;

l)      Change of dealership location or the establishment, directly or indirectly, of an additional location for the sale or service of any Products without the prior written consent of Azimut;

m)      Failure of Dealer adequately to represent, promote, sell or service the Products or to achieve minimum sales of the Products from time to time agreed to by the parties or in the absence of such an agreement as established by Azimut based upon sales of other dealers in similar territories; or the failure of Dealer to implement or carry out measures which, in Azimut's opinion, would result in the improvement to Azimut's satisfaction of Dealer's representation, promotion, sales or service of the Products;

n)      Dealer's breach of, or failure to comply with, any term or condition contained in the Agreement.

o)      Insolvency by any definition of Dealer; or the commission of any act of bankruptcy; or the existence of facts or circumstances which would allow the voluntary commencement by Dealer or the involuntary commencement against Dealer of any proceedings under any bankruptcy act or law or under any state insolvency law; or the filing of a petition by or against Dealer under any bankruptcy or insolvency law; or the appointment of a receiver or other officer having similar powers for Dealer or the Dealership Operations; or any levy under attachment, garnishment or execution or similar process which is not, within ten (10) days, vacated or removed by payment or bonding.

18.4    Azimut may select any applicable provision under which it elects to terminate the Agreement, and give notice thereunder, notwithstanding the existence of any other grounds for termination or the reference to such other grounds in the notice of termination. The failure by Azimut to specify ground(s) for cancellation in its notice shall not preclude Azimut from later establishing that termination is also supported by any unspecified ground(s).

18.5    In any case of expiration or termination as of right of this Contract by Azimut, the DEALER will have no right to any indemnity, damage or reimbursement. On the contrary AZIMUT reserves the right to seek injunctive relief and all other damages, cost and expenses incurred by it in case of termination for a DEALER's event of default or breach of any obligation herein stated. Dealer shall be responsible to pay all attorney fees and costs incurred by Azimut (i) to enforce its rights hereunder; (ii) terminating this Agreement following an event of default by Dealer or (iii) otherwise arising from breach by Dealer of any one or more of its obligations hereunder.

**ARTICLE XIX — OBLIGATIONS OF THE PARTIES UPON TERMINATION OR EXPIRATION OF THE CONTRACT**

19.1    The acceptance by Azimut of orders from Dealer or the continued sale of Products to Dealer or any other act or course of dealing of Azimut after termination or expiration of the Agreement shall not be construed as or deemed to be a renewal of the Agreement for any further term or a waiver of such termination. Any dealings after termination or expiration shall be on a day-to-day basis. In all cases, Dealer agrees to conduct itself and its operations until the effective date of termination, and after termination or expiration of the Agreement, so as not to injure the reputation or goodwill of the Trademarks.

19.2    Upon the mailing of a written notice of termination or after date of the expiration of the Agreement without renewal, Azimut shall have the right to cancel all pending orders of Dealer for Products, special tools and equipment, whether previously accepted by Azimut or not, except as specifically otherwise provided in this Article 19. Notwithstanding the foregoing, if Azimut chooses to fill any orders, it shall not be obligated to fill any other orders.

19.3    Not later than the effective date of the termination or expiration of the Agreement, Dealer shall cease to hold itself out as an authorized dealer of the Products and discontinue selling or servicing any Products as an authorized dealer.

19.4    In addition to any other requirements set forth in the Agreement, not later than the effective date of the termination or expiration of the Agreement, Dealer shall, at its sole expense, discontinue any and all uses of the Trademarks and all words, symbols and marks which may be confusingly similar thereto; remove all signs bearing Trademarks and destroy all stationery, repair orders, advertising and solicitation materials, and all other printed matter bearing Trademarks or referring directly or indirectly to Azimut or the Products in any way which might make it appear to any members of the public that Dealer is still an authorized dealer. The foregoing shall include without limitation discontinuing the use of Trademarks appearing in connection with Dealer's business name or any advertising. Dealer shall also deliver to Azimut, at Azimut's place of business, or to a person designated by Azimut, or shall destroy upon request by Azimut, any and all technical or service literature, advertising and other printed material then in Dealer's possession which relates to the Products and which was acquired or obtained by Dealer from Azimut. Dealer shall destroy any sign bearing Trademarks which is not to be repurchased by Azimut.

19.5    Upon request of Azimut, Dealer shall deliver to Azimut copies of Dealer's records of predelivery service, warranty service, recall or update service or other service of the Products.

19.6.    Upon termination or expiration of this Agreement, upon (i) request of Dealer given no later than five (5) days after the effective date of termination or expiration, Azimut may, but shall not be required to, or (ii) notice from Azimut to Dealer within five (5) days after the effecitve date of termination or expiration, Azimut may, but shall not be obligated to, repurchase from Dealer all Products in Dealer's inventory which have fully

been paid for by Dealer, and all signs which use Trademarks as authorized in advance by Azimut and all special tools and equipment Azimut designed specifically for service of the Products and which were purchased from Azimut and are usable on current Products, all such repurchases being subject to the provisions of this Article 19. In the case of Products other than parts, Azimut may repurchase those Products which, when Azimut accepts sole possession, are new and of the then current model year, as designated by Azimut, unused, undamaged and in first class resalable condition, regardless of whether or not Azimut has exercised its right of inspection. In the case of parts, Azimut may repurchase those parts which, when Azimut accepts sole possession, are new, listed in the current parts price book, unused, undamaged, in their original package and in first class resalable condition. In the case of signs, tools and equipment, Azimut may repurchase those signs which use Trademarks as authorized in advance by Azimut and those special tools and equipment designed specifically for service of Products which were purchased from Azimut and are usable on current Products, provided that such signs, tools and equipment are less than five (5) years old and are in good working order.

a)    Azimut's repurchase for any reason whatsoever is on the condition that (i) Dealer furnishes a complete and accurate inventory to Azimut within thirty (30) days after the termination or expiration without renewal of the Agreement and complies strictly with all procedures and conditions of repurchase set forth herein and directives issued by Azimut and (ii) all Products repurchases are free and clear of all liens and encumbrances and (iii) Dealer shall obtain any consents and execute any documents necessary to vest clear title, free of other interests, in Azimut, and Dealer shall be responsible for complying with all applicable procedures, including without limitation those relating to bulk transfers . Azimut shall have the right and option to assign to another person or entity the right to purchase any such Products, signs, tools and equipment.

b)    The price for Products shall be the price at which they were originally purchased by Dealer from Azimut or the price last established by Azimut for the sale of identical Products, whichever may be lower, and in either case shall be less all prior refunds and allowances made by Azimut with respect thereto, if any. The price for signs, tools and equipment shall be the price paid by Dealer reduced by straight-line depreciation on the basis of a useful life of five (5) years. In all cases, the price shall be reduced by any applicable restocking charge which may be in effect at the time of Azimut's receipt of goods to be repurchased.

c)    Dealer agrees to store, at its sole expense, all Products and other items which Azimut desires or is obligated to repurchase until receipt from Azimut of rejection of repurchase or instructions for shipping and return to Azimut. Dealer agrees strictly to follow and abide by all instructions for return as may be issued from time to time by Azimut. All Products shall be properly and suitably packaged and containered for safe transportation to Azimut. All

damage, regardless of nature or cause, shall be the responsibility of Dealer until the Products are inspected and accepted by Azimut for repurchase. Azimut, or its designee, at such reasonable time and for such a reasonable period of time as Azimut may determine, shall have the right to enter the premises where items for repurchase are being held for the purpose of checking the inventory submitted by Dealer or examining, inspecting and inventorying any and all Products. If Azimut agrees to repurchase and Dealer fails to furnish all inventory, Dealer shall reimburse Azimut for all costs incurred by Azimut in taking an inventory.

d) As to all Products, equipment and tools tendered to Azimut, Dealer shall pay all freight and insurance charges from Dealer to the place of delivery designated by Azimut, provided that Dealer shall not be liable for any amount greater than the freight and insurance charges from Dealer to Azimut's closest warehouse or parts center as Azimut may designate. Claims for damage caused or allegedly caused by any carrier shall be the sole responsibility of Dealer, and in no event shall Azimut be obligated to make a claim against a carrier or be liable to Dealer for damage.

e) The purchase price for any repurchase shall be reduced by the amount of any and all obligations or money owed by Dealer to Azimut. The payment due from Azimut to Dealer for any repurchase will be made by Azimut after receipt of the goods to be repurchased and after all debts and credits have been ascertained and applied to Dealer's accounts and Dealer has delivered to Azimut the manufacturer's certificate of origin or other document of title for Products tendered to Azimut for repurchase. In the event it be found that a balance is due from Dealer to Azimut, Dealer shall pay such sum to Azimut within ten (10) days of written notice of such balance. Only those Products, equipment and tools meeting the requirements of this Section 18 shall be eligible for repurchase by Azimut, at its option. Azimut shall not be obligated to give Dealer credit for any Products, equipment or tools which do not meet those requirements.

19.7 -Any Products, tools or materials in Dealer's possession acquired from Azimut for which the Dealer has not paid Azimut, shall be immediately returned to Azimut upon termination or expiration of this Agreement at Dealer's cost.

19.8 - AZIMUT shall at any time after termination or expiration of this Contract have no obligation but solely the right to establish and maintain any kind of relationship with ultimate purchasers, agents, distributors, dealers, retailers, clients, customers or other distribution outlets at any level of distribution or sale which have or will distribute, sell or handle AZIMUT's Products in the Territory and any other such ultimate purchasers, agents, distributors, dealers, retailers, clients, customers, or other distribution outlets at any level of distribution, utilized or solicited by the DEALER during the term of such agreement.

### ARTICLE XX - <u>MISCELLANEOUS</u>

20.1 – This Contract cancels, supersedes and replaces all previous documents or agreements exchanged or executed by and between the parties and all prior course of conduct, business dealings and industry custom and practice.

20.2 – All Appendix attached to this Contract constitute an integral part of it.

20.3 - No modification or amendment made to any Appendix shall be valid unless executed in writing by both Parties hereto. Any executed modification or amendment shall bear the date of such amendment or modification, is valid and effective as of such date and shall be substitutive of the prior Appendix it has amended or modified.

20.4 - The present agreement shall not be amended or modified, except by a written document signed by both parties and shall not be modified by any prior or subsequent course of conduct, business dealings and/or industry custom and practice.

20.5 - Any waiver of any breach of any term or condition of this agreement with respect to Dealer or any other dealer agreement with respect to any other dealer shall not operate as a waiver of any other breach of such term or condition, or of any other term or condition hereof nor shall any failure to enforce any provision hereof or any other dealer agreement operate as a waiver of such provision or any other provision hereof.

20.6- This agreement and the rights and obligations of the parties hereunder shall be governed by and constructed in accordance with the laws of Italy, without regard to conflicts of laws.

20.7 -Any dispute arising out or in connection with the execution, interpretation or termination of this Contract or the relationship between Dealer and Azimut must be exclusively submitted by the Parties to and determined by a sole arbitrator in the City of Turin in accordance with the Rules of the Turin Chamber of Commerce and the Italian Civil Code, such arbitrator to be legally qualified and to be appointed by agreement between parties or (failing agreement within fourteen days after the written request referred to) by the President of the Turin Chamber of Commerce. The decision of the sole arbitrator will be final and binding.

20.8- The Dealer hereby expressly waives to register this Dealership Contract in any case and under any circumstances and undertakes not to enforce any eventual local law that could void or in any way limit the rights of Azimut for any reason whatsoever. The Dealer accepts that this waiver of right is an essential condition for the validity of the present Dealership Contract and declares that such waiver has been freely and consciously agreed by the parties and for no reason will be claimed to be an unconscionable clause of the contract.

For                                              For

AZIMUT-BENETTI S.P.A                   SKIPPER MARINE HOLDING INC.

Date: 1/17/2010                              1/17/2010

# A P P E N D I X – 1
## TO THE AZIMUT DEALERSHIP CONTRACT

## DEALER QUALIFICATION BOOK

-- Dealer Qualification Book has been already sent to the Dealer --

# . A P P E N D I X - 2
## TO THE AZIMUT DEALERSHIP CONTRACT

### <u>ORDER CONTRACT</u>

# A P P E N D I X - 3
## TO THE AZIMUT DEALERSHIP CONTRACT

## LIST OF PRODUCTS

### *MOTORCRUISER LINE*

AZIMUT 43'
AZIMUT 47'
AZIMUT 50'
AZIMUT 53'
AZIMUT 55'
AZIMUT 58'
AZIMUT 62'
AZIMUT 68'
AZIMUT 70'

### *MOTORYACHT LINE*

AZIMUT 78'
AZIMUT 82'
AZIMUT 88'

### *S LINE RANGE:*

AZIMUT 43'S
AZIMUT 62'S
AZIMUT 68'S
AZIMUT 72'S
AZIMUT 86'S

**A P P E N D I X - 4**

**TO THE AZIMUT DEALERSHIP CONTRACT**

**AZIMUT WARRANTY BOOK**

## A P P E N D I X - 5
### TO THE AZIMUT DEALERSHIP CONTRACT